1  Robert J. McKennon (SBN 123176) *rm@mckennonlawgroup.com*
2  Joseph S. McMillen (SBN 283856) *jm@mckennonlawgroup.com*
   **McKENNON LAW GROUP PC**
3  20321 SW Birch Street, Suite 200
   Newport Beach, California 92660
4  Phone:  949-387-9595  |  Fax:  949-385-5165

5  Attorneys for Plaintiff Matthew Bergendahl

6

7

8              **UNITED STATES DISTRICT COURT**

9      **CENTRAL DISTRICT OF CALIFORNIA - WESTERN DIVISION**

10

11 | MATTHEW BERGENDAHL, JR.,          | Case No.:

12 |                                   | Action Filed:
                  Plaintiff,
13 | vs.                               | Trial Date: None

14 | GUARDIAN LIFE INSURANCE
   | COMPANY OF AMERICA; and          | **COMPLAINT FOR RECOVERY OF**
15 | DOES 1 through 10, inclusive,     | **ERISA PLAN BENEFITS;**
   |                                   | **ENFORCEMENT AND**
16 |                                   | **CLARIFICATION OF RIGHTS;**
   |                  Defendants.      | **PREJUDGMENT INTEREST AND**
17 |                                   | **ATTORNEYS' FEES**

18

19                                     [Filed Concurrently With:
20                                       -  Summons;
                                         -  Certification and Notice of Interested
21                                          Parties; and
                                         -  Civil Case Cover Sheet]
22

23

24

25

26

27

28

**NATURE OF ACTION**

1.      This case involves the tragic death at just 55 years old of Cynthia Bergendahl ("Cynthia" or "Ms. Bergendahl"), the late mother of Plaintiff Matthew Bergendahl, and Mr. Bergendahl's dispute with his late mother's accidental death insurer, Defendant Guardian Life Insurance Company of America ("Guardian"). Ms. Bergendahl had purchased accidental-death coverage many years earlier through her employer's employee welfare benefit plan.  The coverage was funded by a group insurance policy issued by Guardian to her employer, Vanda Pharmaceuticals Inc. ("Vanda"), for the benefit of its employees, group policy number G-00416009 (the "Policy").  When Ms. Bergendahl passed away, Mr. Bergendahl submitted a claim.  Guardian denied it on the incorrect ground that the death was caused in substantial part by a pre-existing condition of cirrhosis.  The evidence, both direct and circumstantial, shows that the death was caused by an accident and that any health condition from which she was suffering was not a substantial contributing factor to her death.  Therefore, her death is covered by the Policy as interpreted in Ninth Circuit precedent, *Dowdy v. Metropolitan Life Insurance Company,* 890 F.3d 802 (9th Cir. 2018).

2.      Plaintiff brings this action to recover accidental death & dismember-ment ("AD&D") insurance benefits and to enforce and clarify his rights under Section 502(a)(1)(B) of the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. Section 1132(a)(1)(B).

**THE PARTIES**

3.      Plaintiff Matthew Bergendahl, Jr. is an individual who, at all times relevant to this action, was a citizen and resident of the State of California, residing in Diamond Bar, California, which is in the County of Los Angeles.  At all times relevant to this action, Plaintiff was a beneficiary, as defined by ERISA Section 3(8), 29 U.S.C. Section 1002(8), in the employee welfare benefit plan established by

Case No.:



1   Vanda, the employer of his recently deceased mother, Cynthia Bergendahl, which

2   plan is at issue in this action.

3          4.     Defendant Guardian is and at all times relevant was a New York

4   mutual company with its principal place of business in New York, duly authorized

5   to do, and doing, business within the Central District Court of California, namely,

6   issuing group life insurance policies to employers there, including Vanda.

7   Defendant Guardian is, and at all times relevant was, an ERISA plan fiduciary.

8   Guardian funded the Vanda employee welfare benefit plan and administered

9   benefits provided to Vanda employees and their beneficiaries, including Plaintiff's

10  deceased mother, by issuing the Policy to Vanda and through it insuring employees

11  of Vanda for AD&D insurance.  Guardian acted as the claims administrator for the

12  Plaintiff's AD&D insurance claim and generally for claims made under its group

13  policy and the Vanda employee welfare benefit plan.  Guardian acted as a plan

14  administrator in connection with the Policy.

15         5.     The true names and capacities, whether individual, corporate, associate

16  or otherwise, of the defendants named herein as DOES 1 through 10, inclusive, are

17  unknown to Plaintiff at this time, who therefore sues DOES 1 through 10 by

18  fictitious names and will ask leave of the Court to amend this Complaint to show

19  the true names and capacities of DOES 1 through 10 when the same are ascertained;

20  DOES 1 through 10 are sued as principals and/or agents, servants, attorneys or

21  employees of such principals, and all of the acts performed by them were within the

22  course and scope of their authority and employment.

23         6.     Plaintiff is informed and believes and thereupon alleges that each of

24  DOES 1 through 10 is legally responsible in some manner for the events and

25  happenings referred to herein, and directly and proximately caused the damages and

26  injuries to Plaintiff as hereinafter alleged.

27

28

Case No.:



1

**JURISDICTION AND VENUE**

2    7.    This Court has subject matter jurisdiction over Plaintiff's claims

3   pursuant to ERISA Section 502(e) and (f), 29 U.S.C. Section 1132(e) and (f) and 28

4   U.S.C. Section 1331.  It also has diversity jurisdiction under 28 U.S.C. Section 1332

5   because Mr. Bergendahl and Guardian are domiciled in different states (California

6   and New York, respectively) and the amount in controversy exceeds $75,000,

7   exclusive of interest and costs.

8    8.    Venue lies in the Central District of California, Western Division

9   pursuant to ERISA Section 502(e)(2), 29 U.S.C. Section 1132(e)(2), because

10   Plaintiff resides in this district, some of the alleged breaches occurred in this district

11   and the ERISA-governed plan at issue was administered in part in this district.

12   Venue is also proper pursuant to 28 U.S.C. Section 1391(b) because a substantial

13   part of the events or omissions giving rise to Plaintiff's claim occurred within this

14   district – namely, Defendant denied Plaintiff's claim in Diamond Bar, County of

15   Los Angeles, California, which is within this district.

16

**FACTUAL BACKGROUND**

17    9.    At the time of her death in 2020, Cynthia worked for Vanda, as she

18   had for many years.  Several years ago, she enrolled in Vanda's employee welfare

19   benefit plan, including the plan's life and accidental death benefits.  The benefits are

20   funded by the Policy.  The Policy was issued for the benefit of Vanda's employees,

21   including Cynthia, and their designated beneficiaries.

22    10.    Cynthia named her son, Matthew Bergendahl, as the sole beneficiary to

23   the Policy for the life coverage and in the event that she died of an accident.  The

24   Policy insures Cynthia and her beneficiary, Matthew, in the amount of two times her

25   annual earnings, rounded up to the nearest $1,000, up to a maximum of $250,000.

26    11.    The Policy includes the following accidental death insuring provision

27   and pertinent exclusion:

28

Case No.:



**Employee Basic Accidental Death and Dismemberment Benefits**

**The Benefit:** We'll pay the benefits described below if an employee suffers an irreversible covered loss [Loss of Life] due to an accident that occurs while he or she is insured. *The loss must be a direct result of the accident, independent of all other causes.* And, it must occur within 365 days of the date of the accident.

**Covered Losses:** Benefits will be only for losses identified in the following table. The Insurance Amount is shown in the Schedule of Benefits.

### ACCIDENTAL DEATH AND DISMEMBERMENT

| Covered Loss | Benefit |
| --- | --- |
| Loss of Life | 100% of Insurance Amount |

. . .

**Exclusions:**  We won't pay for any loss *caused directly or indirectly: . . . by sickness, disease, mental infirmity, medical or surgical treatment . . .*

*See* Administrative Record ("AR") at 353 (bold emphasis in original; italic emphasis added).

    12.    On April 12, 2020, Cynthia accidentally fell and struck her head on the hardwood floor in the living room of her home when she attempted to get up out of her chair.[1]  Matthew and his younger brother, Nick, both testified that she struck her head "extremely hard."  Nick testified that he personally witnessed her hit her head so hard on the floor that she immediately started crying from the severe pain.  He

---

[1] On March 30, 2021, Matthew signed a declaration under penalty of perjury, describing in detail how his mom died, including all of the facts described herein. On April 7, 2021, Matthew's younger brother Nick, signed a declaration echoing what Matthew said.

Case No.:

stated that, "I witnessed her fall flat on the side of her head. I was standing a few feet away and I heard a loud bump as she hit the ground. She struck her head extremely hard on the hardwood floor. She immediately started crying . . . ." Cynthia had stood up from her chair, bumped into another chair, then fell flat on the right side of her face.  Nick verified that his mom sustained a substantially large, prominent swelling on her head and the side of her face from her accidental fall that was very concerning to him, that she was in severe pain and had terrible headaches but that she refused medical treatment each time he and Matthew checked up on her. Matthew and Nick agreed to frequently check on their mom and, each time, they saw prominent bruising on her head/face where she fell.  On April 24, 2020, during one of their check-ups, Matthew insisted that his mom go to a hospital.  He called 911 because he witnessed alarming symptoms.  He stated that she had acted normal when he first arrived, but one to two hours later, her speech became slurred and disorganized.  She was disoriented and confused and had difficulty with balancing.

13.     On April 24, 2020, Cynthia was taken to Hoag Hospital via ambulance and admitted.  That day, in the ER upon admission, a brain CT scan objectively showed that Cynthia had sustained the following from the fall: (1) A "large bifrontal intraparenchymal hematoma"[2] with an estimated volume of 70 cc; (2) Local mass effect (pressure on the brain from the bleeding/hematoma); (3) An intraventricular extension of hemorrhage (the ventricles are the four cavities deep inside the brain, so the hemorrhage/bleeding extended deep inside the brain); (4) Acute hydro-cephalus (sudden onset of buildup of cerebrospinal fluid in the brain's ventricles, increasing their size and putting pressure on the brain);[3] and (5) Scattered bilateral

---

[2] A hematoma is a collection of blood within the skull.  An intraparenchymal hematoma, also known as an intracerebral hematoma ("IH"), "occurs when blood pools in the tissues of the brain."  In other words, the bleeding is *inside* the brain's tissue, not outside it or on its surface as in a subdural hematoma.  *See Intracranial Hematoma,* Mayo Clinic, http://www.mayoclinic.org/diseases-conditions/intracranial-hematoma/symptoms-causes/syc-20356145 (last visited Jan. 20, 2022).

[3] *See Hydrocephalus,* Mayo Clinic, http://www.mayoclinic.org/diseases-conditions/hydrocephalus/symptoms-causes/syc-20373604 (last visited Jan. 20, 2022).

Case No.:



areas of subarachnoid hemorrhage (bleeding in the space between the brain and its surrounding protective arachnoid membrane).[4]  The CT scan did <u>not</u> show a subdural hematoma (a blood buildup near the skull below the dura).[5]

14.  On April 25, 2020 at 1:25 a.m., Christopher Michael Duma, M.D., a neurosurgeon with Hoag Hospital, performed an emergency craniotomy surgery shortly after Cynthia was admitted, to remove the collection of blood inside the brain and thus the obstruction to the ventricles draining properly, to reduce the pressure on her brain.  Dr. Duma's pre- and post-operative diagnosis was "massive bifrontal intracerebral hemorrhage and intraventricular hemorrhage," i.e., a massive bleed deep inside the brain from a severe traumatic brain injury.  Dr. Duma told Matthew that he needed to do this surgery because his mom had a massive bifrontal intraventricular hemorrhage, a leakage of blood into her brain ventricles and a subarachnoid hemorrhage, consistent with a fall on her head.  The surgery was successful.  A post-surgery CT scan on April 25, 2020 showed "decreased size of the large bifrontal intraparenchymal hematoma."  Dr. Duma told Matthew that there were no complications from the successful craniotomy surgery.  Despite successful medical treatment and surgery, Cynthia died on May 19, 2020, after staying in the ICU/hospital and then hospice the entire time.  The hospice doctors told Matthew that Cynthia suffered a large brain bleed, which was due to the extreme impact to her head caused by her fall, which caused her death.  They said nothing about her

---

[4] *See Subarachnoid Hemorrhage*, Mayo Clinic, *http://www.mayoclinic.org/diseases-conditions/subarachnoid-hemorrhage/symptoms-causes/syc-20361009* (last visited Jan. 20, 2022).

[5] A subdural hematoma is a buildup of blood farther out than with a subarachnoid hemorrhage, closer to the skull; i.e., a buildup of blood between the arachnoid membrane (which surrounds the brain tissue and is closer to the brain than the dura) and the dura membrane (another protective membrane that surrounds the brain, but which is the outermost membrane, just inside the skull).  *See Subdural Hematoma,* Cedars-Sinai, *http://www.cedars-sinai.org/health-library/diseases-and-conditions/s/subdural-hematoma.html (last visited Jan. 20, 2022)*; and *Intracranial Hematoma,* Mayo Clinic, http://www.mayoclinic.org/diseases-conditions/intracranial-hematoma/symptoms-causes/syc-20356145 (last visited Jan. 20, 2022).

Case No.:



liver cirrhosis as a cause of death.[6]

15.     Prior to her death, on April 25 through May 5, 2020, Jose J. Puangco, M.D., ABSM, FAASM, a Hoag Hospital neurologist and neurosurgeon, monitored Cynthia in the ICU daily.  On April 25, 2020, Dr. Puangco examined Cynthia in person for over 40 minutes, conducted a comprehensive neurological exam and reviewed her medical chart and labs and the April 24 and other brain CT scans/ imaging.  **Based thereon, Dr. Puangco concluded that, "on admission" (before any medical or surgical treatment had occurred and before her liver disease could have contributed to any increased bleeding during or after surgery), Cynthia had a 72% chance of dying (only a 28% of surviving),** *solely* **because of the severity of the traumatic brain injury that she sustained when she fell and hit her head.  That was Dr. Puangco's opinion irrespective of whether Cynthia had liver cirrhosis**.

16.     Dr. Puangco documented in his progress notes that Cynthia had cirrhosis, but he did not mention her cirrhosis in assessing her mortality rate. Dr. Puangco used the intracerebral hemorrhage score ("ICH score") scale to rate Cynthia's likelihood of mortality.[7]  He determined that her ICH score was 3 and that she thus had a 72% mortality rate.  He gave her: (1) One point because her hemorrhage injury went *inside* her brain ventricles (not just on the brain's surface as in a subdural hematoma, the former being much more serious); (2) One point because the bleed/hemorrhage was large (greater than 30 cubic cm); and (3) One

---

[6] Matthew testified that he does not believe liver disease caused his mom's death. He stated, "[M] mom had lived with liver cirrhosis for 1-2 years and never faced imminent death because of it. She was still relatively young. Yet, immediately after she accidentally fell and hit her head extremely hard on the hardwood floor, she got a large brain bleed (according to her doctors, evidenced by the bruising on her face, and admitted by Guardian), and then died about a month later."

[7] The ICH score is a standardized clinical grading scale widely used by neurologists to rate the severity of a patient's intracerebral hemorrhage and subsequent 30-day mortality rate.  The ICH score is intended to be used immediately after the diagnosis of intracerebral hemorrhage is made. *See Intracerebral Hemorrhage (ICH) Score*, MDCalc, http://www.mdcalc.com/intracerebral-hemorrhage-ich-score#use-cases (last visited on Jan. 20, 2022).



point because of her eye, motor and verbal response that he observed during her coma, i.e., her Glasgow Coma Scale ("GCS") score of "5-12."[8] **Dr. Puangco did not assign any ICH score points to Cynthia because of her liver disease.** He instead concluded that she scored three points on the ICH scale based on the severity of her coma and the large bleed *into* her brain ventricles. And, therefore, that she had a 72% chance of dying just from that, irrespective of any preexisting natural disease such as her liver cirrhosis.

17.     On April 26 and through May 5, 2020, Dr. Puangco continued to monitor Cynthia and documented the same ICH score of three (and same correlated 72% chance of death during this entire time), all stemming from her pre-surgery initial traumatic brain injury upon admission to the hospital.

18.     On May 5, 2020, Cynthia was transferred to Hoag Hospital's hospice/ palliative care unit, to Vincent Nguyen, D.O. Dr. Nguyen, during his initial exam, documented that she had sustained from a fall a massive bifrontal intracerebral hemorrhage (extending into her ventricles) and resulting hydrocephalus, caused by a fall. He noted her craniotomy surgery performed to correct her IH and that she was "successfully extubated and transferred out of the Neuro ICU" following surgery. Dr. Nguyen concluded that, despite successful surgery, Cynthia had a poor prognosis, was at risk for sudden death **and had a 72% likelihood of mortality according to ICU,** *upon admission*.

19.     On April 8, 2021, after conducting an extensive investigation into the cause of Cynthia's death and whether her pre-existing liver condition contributed to it, Howard S. Robin, M.D. authored a report of his professional medical opinions. Dr. Robin is a Board-certified pathologist with 45 years of pathology experience, 30-plus years subspecializing in liver and blood pathology, and has twice been

---

[8] *See Glasgow Coma Scale/Score (GCS),* MDCalc, http://www.mdcalc.com/ glasgow-coma-scale-score-gcs (last visited Jan. 20, 2022).

recognized by his peers through *San Diego Magazine* as a top-doctor.[9]  In his report,

Dr. Robin explained that, to accurately assess the cause of death, a forensic

pathologist has a duty to review all aspects of the death investigation, including

gathering relevant information from family members, police/coroner reports,

medical records and hospital records.  Dr. Robin did all of this.

20.     Dr. Robin obtained and reviewed: (1) the March 30, 2021 declaration

of Matthew Bergendahl, Cynthia's son who witnessed many of the events leading

up to her death; (2) the April 7, 2021 declaration of Nicholas Bergendahl, Cynthia's

younger son who personally witnessed her accidentally fall and strike her head with

great force on the hardwood floor; (3) the official Certificate of Death from the

County of Orange, California, dated June 4, 2020 (that contains the Coroner's and

treating palliative care physician's opinions on the cause of death: the brain

hematoma caused by Cynthia's accidental fall caused her death, not her liver

cirrhosis that was only a contributing factor); (4) the Coroner's Investigation Report

from the Orange County Sheriff-Coroner, dated May 20, 2020; (5) medical records

from Richard Quist, M.D. (Cynthia's gastroenterologist/internist/liver physician)

from March 6 to July 1, 2019; (6) medical/hospital records and imaging from Hoag

Hospital Newport Beach and from Hoag Hospital Inpatient Hospice/Palliative Care,

from April 24 to May 19, 2020 (including all of the medical records summarized

---

[9] Dr. Robin has pre-eminent qualifications catered to the key issues in this case. He is a Board-certified pathologist who specializes in blood clotting and liver pathology.  In 1971, he obtained his medical degree and then did his residency in anatomic and clinical pathology from 1972 to 1976. Over the last 45 years in pathology practice, he has performed thousands of autopsies, both for the San Diego County Coroner's Office and for private hospitals.  He has 35 years' experience as a medical director for clinical laboratories performing blood clotting tests.  For 30 years, he practiced liver pathology for the Sharp network of hospitals and was the medical director for Sharp Memorial Hospital's blood transfusion center, where he also was on the Board of Directors.  He was the Chairman of Sharp Memorial Hospital's Pathology Department for ten years.  He has also acted as the President and was on the Board of Directors for San Diego Blood Bank and held the same positions for Pacific Rim Pathology.  Dr. Robin was twice awarded the "Physician Recognition Award by Peers" from *San Diego Magazine*.  He has authored numerous medical books, articles and abstracts including ones on blood issues and coroner issues in the *American Journal of Forensic Medical Pathology*.  *See* A.R. at 1748, 1758-65.

-9-

Case No.:

1  above and in Guardian's administrative record, from the time of Cynthia's hospital

2  admission on April 24, 2020 until the date when she died, May 19, 2020); (7) the

3  medical peer-review report by Marvin Pietruszka, M.D. (of Exam Coordinators

4  Network ("ECN") for Guardian, dated October 22, 2020; and (8) Guardian's denial

5  of accidental death benefits letter, dated October 28, 2020.

6      21.    In formulating his opinions, Dr. Robin carefully reviewed these

7  materials and also consulted nine different medically accepted, peer-reviewed

8  scholarly articles and studies from medical journals and other medical sources, such

9  as the World Health Organization, *The Journal of Trauma*, *Blood* and *Injury*, on the

10 relevant topics of: Advances in the Understanding of Trauma-Induced

11 Coagulopathy,[10] Early Coagulopathy in Trauma Patients on Scene and Upon

12 Hospital Admission, Early Coagulopathy Predicts Mortality in Trauma, Acute

13 Coagulopathy in Isolated Blunt Traumatic Brain Injury, Coagulopathy in Severe

14 Traumatic Brain Injury, Coagulopathy as a Predictor of Mortality After Penetrating

15 Traumatic Brain Injury, The Association of Preexisting Medical Conditions With

16 In-Hospital Mortality in Multiple-Trauma Patients, Traumatic Brain Injury-Related

17 Emergency Department Visits, Hospitalizations and Deaths, and Traumatic Brain

18 Injury Data.

19     22.    Based on his investigation, Dr. Robin described in detail how Cynthia's

20 accident, injury and death occurred, including discussing all of the facts of the fall

21 and events leading up to her death taken from the Bergendahls' declarations, as well

22 as the facts taken from the Coroner's Investigation Report and the medical records

23 relating to Cynthia's medical diagnosis, surgery, treatment and eventual death.  *See*

24 Dr. Robin's 4/8/21 Rpt., pp. 3-4, for a more detailed discussion of the accident and

25 the injury.

26

---

27 [10] Coagulopathy is a condition in which the blood's ability to clot is impaired.
This condition can cause prolonged or excessive bleeding. *See Coagulopathy*,
28 Healthgrades, https://www.healthgrades.com/right-care/vascular-conditions/
coagulopathy (last visited Jan. 20, 2022).

Case No.:



23.     Dr. Robin, based on his exhaustive investigation (including his review of the above-listed witness declarations, the medical, law enforcement and investigative records and the scholarly medical literature) and his pre-eminent qualifications as a board-certified pathologist for 45 years subspecializing in liver and blood pathology, concluded that, in his professional medical opinion:

- *Cynthia's "death was caused by an intracerebral hemorrhage [bleeding deep inside her brain tissue, not at its surface] due to severe brain trauma" that occurred when she accidentally fell.  She "suffered a severe traumatic brain injury when she accidentally fell and struck her head on the hardwood floor," which hemorrhaging led to her death from respiratory failure.*

- *Her "clinical history of underlying liver cirrhosis did not substantially contribute to the death of Cynthia Ann Bergendahl. Nor did any other preexisting natural disease, sickness, health condition, medical treatment, or surgical treatment including her brain surgery."*

- The cause of death was Cynthia's intracerebral hemorrhage due to severe brain trauma when she accidentally fell and struck her head.

- The manner of death was her accidental fall.

- The ultimate mechanism of death was her respiratory failure.  But respiratory failure was not the cause of death.  Cynthia's "death and respiratory failure was due to her accidental fall and severe traumatic brain injury, not from natural disease, sickness, medical treatment, or surgical treatment."  (Emphasis added.)

24.     Dr. Robin reasoned that Cynthia's brain injury, given its nature and location deep inside her brain tissue, is medically categorized as a "severe traumatic brain injury."  Such an injury is more often fatal than a subdural hematoma because a subdural injury is located outside the brain at its most exterior protective membrane near the skull, not embedded inside the brain as was Cynthia's injury, an



*intracerebral* hemorrhage that extended into her ventricles.  Dr. Robin explained that the CT scans and imaging of Cynthia's brain taken at Hoag Hospital objectively proved that she sustained a large bifrontal *intracerebral* hematoma deep inside her brain tissue, not at the brain's most exterior surface near the skull as in a subdural hematoma, together with resulting local mass effect and acute hydrocephalus, i.e., pressure on her brain from the hematoma/blood buildup and from the acute cerebrospinal fluid buildup in her brain's ventricles.  "These were the objective imaging findings observed by the Hoag Hospital radiologists and reflected the treating physicians' opinions, as well."  He explained that Cynthia's vomiting and mental confusion on admission – she mistakenly thought she fell off a horse – were consistent with a severe traumatic internal brain injury.  They are both common symptoms of intracranial pressure.

25.     Dr. Robin explained the medical basis for his opinion that Cynthia's liver cirrhosis did not substantially contribute to her death but that her intracranial brain trauma did.  He explained that, in and of itself, intracranial trauma is a major, life-threatening injury because it frequently causes coagulopathy in healthy individuals: "Severe [traumatic brain injury] *frequently leads to a coagulopathy* like Ms. Bergendahl experienced, *irrespective of liver disease*."  (Emphasis added.) He explained that Hoag's medical lab data taken upon Cynthia's admission to the hospital supports the assertion that is what occurred in Cynthia's case: that her brain bled profusely and did not clot, not because of her liver disease, but because she fell and struck her head with great force on the hardwood floor causing massive internal trauma and bleeding in her brain.

26.     First, Dr. Robin pointed to Cynthia's normal "aPTT" of 26 seconds (normal is 25-37 seconds).  He explained that the aPTT reflects whether a person's liver is healthy enough to allow the patient to adequately form a blood clot.  Dr. Robin explained that Cynthia's aPTT labs proved that she had adequate coagulation ability from her liver.  Second, he explained that her blood ammonia level proved



the same thing.  It was normal, 15 umol/L (normal is 9-30 umol/L).  He explained that this showed that Cynthia had a functioning liver, not one with the inability to form a clot or with hepatic encephalopathy (in which the liver causes decreased brain function because the liver is not filtering blood properly).[11]  Dr. Robin thus concluded that, despite her liver cirrhosis, these lab results proved that Cynthia had the ability to form a blood clot like a normal, healthy person.

27.    Because Cynthia's blood did not clot after she fell and struck her head – she sustained massive hemorrhaging and hematomas deep within her brain – he reasoned that the severe brain trauma from her hard fall, not her liver disease, must have caused her hemorrhaging.  Dr. Robin again supported his opinion with Cynthia's lab results.  He explained that she had a prolonged prothrombin time ("PT") of 19 seconds, which is "often associated with" coagulopathy, "severe [traumatic brain injury,] and trauma *independent of underlying liver disease*."  (Emphasis added.)

28.    Furthermore, Dr. Robin cited several scholarly, peer-reviewed medical journals and studies to support his opinion that Cynthia's liver cirrhosis did not substantially contribute to her death.  The studies repeatedly found a strong chance of death in studied patients *just* from a traumatic intracerebral brain injury (like Cynthia sustained).  They found that such severe brain injuries are quite serious and often cause death because they frequently lead to blood coagulation problems inside the brain tissue even in otherwise healthy individuals.  For example, Dr. Robin cited to Wafaisade, A., Lefering, R., Tjardes, T. *et al.,* "Acute Coagulopathy in Isolated Blunt Traumatic Brain Injury," *Neurocrit Care* 12, 211-19 (2010), which study found a "ten-fold increased risk of death" merely from a traumatic brain injury having induced coagulopathy, after studying 3,114 patients with isolated traumatic

---

[11] *See* Am. Liver Found., *Diagnosing Hepatic Encephalopathy*, *www.liverfoundation.com*, http://liverfoundation.org/for-patients/about-the-liver/diseases-of-the-liver/hepatic-encephalopathy/diagnosing-hepatic-encephalopathy/#what-is-hepatic-encephalopathy (last visited Jan. 22, 2022).

Case No.:



brain injury and no other health conditions.  Per the study, "The overall hospital mortality was 50.4% (n = 356) in patients with coagulopathy vs. 17.3% (n = 417) in non-coagulopathic patients."[12]  Per this study and several others (those Dr. Robin cited in footnotes 5, 6 and 7), when a patient sustains a traumatic intracranial brain injury such as an IH like Cynthia sustained, coagulopathy "occurs early, often in a pre-hospital setting, and is closely associated with poor clinical outcomes, often death."  Another study, by Ronald Chang, Jessica C. Cardenas, Charles E. Wade and John B. Holcomb, "Advances in the Understanding of Trauma-Induced Coagulopathy" (*Blood*, 2016 Aug 25;128(8):1043-9), found that traumatic brain injury "is a well-recognized risk for . . . death" and that 25% of trauma patients have trauma-induced coagulopathy (like Cynthia), which is associated with increased likelihood of mortality, because "trauma induces a plethora of biochemical and physiologic changes, and . . . *differences in coagulation parameters between trauma patients and uninjured controls*."[13]  (Emphasis added.)

29.     Moreover, as Dr. Robin pointed out, according to Wutzler S., Maegele M., Marzi I., Spanholtz T., Wafaisade A. and Lefering R., "Trauma Registry of the German Society for Trauma Surgery, Association of Preexisting Medical Conditions with In-Hospital Mortality in Multiple-Trauma Patients" (*J Am Coll Surg*. 2009; 209(1):75-81), ***"studies have consistently shown that coagulopathy is" just as prevalent "in isolated traumatic brain injury patients" with no pre-existing health conditions as it is in those with preexisting health conditions like liver cirrhosis***.  (Emphasis added.)  In other words, a severe traumatic brain injury in and of itself causes coagulopathy and a huge increase in mortality whether the patient is otherwise healthy or not, because the trauma itself causes chemical changes inside the brain's tissue, leading to coagulation problems.  The Wutzler study looked at 11,142 trauma patients, 3,836 of whom had a pre-existing medical condition,

---

[12] *See https://link.springer.com/article/10.1007/s12028-009-9281-1.*

[13] *See https://pubmed.ncbi.nlm.nih.gov/27381903/.*

including liver cirrhosis or other conditions.[14]  Three other peer-reviewed scholarly medical journal articles (those Dr. Robin cited in footnotes 4, 5 and 6) similarly found that: (1) "***Injury to the brain initiates local and systematic coagulation disturbances***;" (2) *Coagulopathy is therefore frequently caused just from an **isolated traumatic brain injury in a patient who has no other medical conditions*; and (3) *Coagulopathy induced by traumatic brain injury "represents a powerful, independent predictor related to prognosis" and death*.  (Emphasis added.)  Two more peer-reviewed medical studies similarly found that, on hospital admission of patients who merely have severe brain trauma, doctors commonly observe trauma-induced coagulation problems and increased PT times (all of which Cynthia had). The studies showed that "An initial abnormal PT increases the odds of dying by 35%."[15]

30.     World Health Organization studies and other studies showed, per Dr. Robin, that: (1) falls are the second-leading cause of accidental death worldwide; (2) just in 2017 in the United States, 17,500 accidental falls led to death from a traumatic brain injury; and (3) Traumatic brain injury-induced coagulopathy is well-recognized in the medical community as a complication of accidental falls which coagulopathy frequently results in death.

31.     Finally, Dr. Robin explained that his opinion is consistent with those of Cynthia's treating physicians who monitored and examined her from the time when she was admitted after her fall until the time when she died.  He agreed with Cynthia's treating neurologist/neurosurgeon from Hoag (Dr. Puangco) that she had a 72% chance of dying based purely on the severity of her traumatic brain injury

---

[14] *See* Sebastian Wutzler, *et al.*, *Association of preexisting medical conditions with in-hospital mortality in multiple-trauma patients*, https://pubmed.ncbi.nlm.nih.gov/19651066/.

[15] *See* studies Dr. Robin cited in footnotes 2 and 3: Bernard Floccard, *et al.*, "Early Coagulopathy in Trauma Patients: An On-Scene and Hospital Admission Study," *Injury*, 2012 Jan;43(1):26-32; and MacLeod J.B., *et al.*, "Early Coagulopathy Predicts Mortality in Trauma," *J Trauma*, 2003 Jul;55(1):39-44.

Case No.:



caused by her fall, even if she did not have liver disease, because her severe internal brain injury alone yielded an ICH score of 3.  Dr. Robin reasoned:

> The neurosurgeon, based on clinical parameters known as the ICH score (three), predicted a 72% mortality risk for Ms. Bergendahl. The neurosurgeon concluded that Ms. Bergendahl only had a 28% chance of surviving *because of the severity of the traumatic brain injury* with 70cc of *intracerebral* hemorrhage.  (Emphasis added.)

32.    Dr. Robin disagreed with Guardian's medical consultant, Dr. Pietruszka.  He concluded that Dr. Pietruszka's opinion (that Cynthia's liver cirrhosis increased her brain bleeding and increased her risk of death by 50%, and that her accidental fall was not the only cause of her death) is incorrect.  Dr. Robin concluded that Cynthia "died with liver cirrhosis, but she did not die from this condition."  He cited the above-referenced medical journals, articles and studies to support his position.  He found Dr. Pietruszka's opinions "disingenuous," particularly his opinion that Cynthia's chance of death increased by 50% due to her cirrhosis, because Dr. Pietruszka did not even attempt to consider the well-recognized effect of severe traumatic brain injury on the coagulation pathway.  Dr. Robin pointed out that Cynthia's low platelet count and increased INR, indicators of a diminished coagulation ability, which Dr. Pietruszka heavily relied on, did not support his opinions.  Rather, such diminished coagulation factors are common in healthy, non-liver-disease patients who suffer trauma to their internal brain tissue because the trauma itself changes the chemical makeup of the brain.  Dr. Robin cited several scholarly medical studies that found otherwise-healthy patients who sustain a severe traumatic brain injury have low platelet counts and diminished coagulation factors because the trauma to the internal brain tissue itself causes this.  As he pointed out, the studies show that severe frontal-lobe injuries due to a fall frequently cause coagulopathy independently of liver disease.  He dismissed Dr. Pietruszka's opinions as not persuasive because the latter did not consider any of these studies or

the medical fact that severe brain trauma often causes coagulopathy and death in otherwise-healthy patients.

33.     On October 28, 2020, Guardian denied Mr. Bergendahl's claim for accidental death benefits.  In its denial letter, Guardian concluded that Cynthia's natural disease of alcohol liver cirrhosis, and her medical and surgical treatment (craniotomy), "impacted" her death.  Guardian stated that while her accidental fall was the direct cause of her death, it was not the only cause "independent of all others" and, therefore, the Policy did not cover her death because of the Policy's language – that no benefits are owed for death caused even in part by sickness, disease, medical treatment or surgical treatment.

34.     Guardian relied on the opinion of a forensic pathologist consultant, Dr. Pietruszka, who reviewed Cynthia's hospital and hospice records, but did not review *any* of the other materials.  Nor did he examine Cynthia's body, inspect the accident scene or speak with the coroner, attending physicians, the Bergendahls or any of the witnesses.  Based on his incomplete review, Dr. Pietruszka concluded that Cynthia's death was caused by an accident – that when she accidentally fell and struck her head, it caused her brain to hemorrhage (bleed) from the trauma, leading to her death.  He said that her death was also caused in part by natural disease (her liver cirrhosis) and subsequent medical and surgical treatment, because her cirrhosis made her more prone to bleeding, i.e., it gave her diminished coagulation ability, hemostasis and thrombocytopenia (all factors that make it more difficult for the blood to clot).  Dr. Pietruszka expressed his opinion that cirrhosis increased Cynthia's risk of bleeding during and after her surgery, worsened the amount of hemorrhaging (from the initial head trauma) and worsened her post-surgical respiratory complications.  On that basis, he opined that cirrhosis "increased the risk of death by at least 50%," yet inconsistently admitted that "*it is difficult to claim* that if the claimant had had normal liver functions, she would not have died due to the

hemorrhage . . . ." (Emphasis added.)[16]  Guardian's benefit decision relied on and mirrored the reasoning of its medical consultant.

35.    On June 2, 2021, Plaintiff submitted his appeal of Guardian's October 28, 2020 decision to deny his claim for accidental death benefits.  Plaintiff based that June 2 appeal on documents contained in Guardian's claim file/administrative record, as well as on declarations of himself and his brother Nicholas relating to how the accident occurred, an expert medical report by Dr. Howard Robin, the official death certificate, the Coroner's Investigation Report and additional medical records from Ms. Bergendahl's treating internist/gastroenterologist/liver physician, Dr. Quist.

36.    On September 29, 2021, based on the same reasoning and despite even more evidence obviously rebutting its conclusion, Guardian reaffirmed its initial decision to deny Plaintiff's claim for accidental death benefits and denied his appeal.  It concluded that, while Ms. Bergendahl's death was caused by her accidental fall, the Policy did not cover it "because her accident was not independent of all other causes . . . her cirrhosis of the liver was *a* contributing factor in her death." (Emphasis added).  Notably and conspicuously, Guardian did not conclude that Ms. Bergendahl's cirrhosis was a substantial contributing factor.  This time, Guardian relied on the opinions of two different medical consultants' peer review reports: (1) One dated August 16, 2021 by Venkatachala Mohan, M.D., a Board-certified gastroenterologist, that concluded that Ms. Bergenthal's death was aspiration pneumonia due to complications of subdural hematoma and that cirrhosis of liver with coagulopathy was a comorbid factor; and (2) A second dated August 18, 2021 by John Hayes, M.D., a Board-certified pathologist, that concluded that

---

[16] Dr. Pietruszka further conceded that: (1) "*It is impossible to hypothesize* if the claimant would not have had liver disease, would she [] have survived;" and (2) Cynthia's death "was a direct result of her [accidental] fall." (Emphasis added.) **In other words, Dr. Pietruszka admitted that Cynthia had a significant risk of death merely from her accidental fall and resulting brain hemorrhage from the trauma, even if she did not have liver cirrhosis and was totally healthy before she struck her head.**

Case No.:



Ms. Bergendahl's death was the direct result of an accident and that cirrhosis was a contributory factor.[17]  Guardian's appeal denial relies on and mirrors the reasoning of its two medical consultants (and Dr. Pietruska).

37.     Guardian did not provide Plaintiff with notice of these new opinions by Drs. Mohan and Hayes before issuing its decision to deny his appeal on September 29, 2021.  Guardian did not give Plaintiff the opportunity to respond to them during the administrative appeal process.  Under the applicable regulations, 29 C.F.R. Section 2560.503-1 (4)(i) and (ii), Guardian was required to do so.  Guardian failed to give Plaintiff a full and fair review during the appeal process.  It did not engage in a good faith exchange of information because it failed to allow Plaintiff or its expert Dr. Robin to review and comment on Drs. Mohan's and Hayes' peer reviews.  As a result of Guardian's misconduct violating the regulations, unless the Court finds that Plaintiff is entitled to payment of the benefits denied, the matter should be remanded to Guardian, based on this serious procedural defect in its appeal denial.  At minimum, the Court must reverse Guardian's claim denial, remand the case back to Guardian, and instruct it to allow Plaintiff to respond to those new peer review reports before Guardian makes its final appeal decision.

38.     But even without a remand to Guardian, the Court should order Guardian to pay Plaintiff the AD&D benefits.  As set forth above, overwhelming evidence unequivocally proves that an unfortunate accident primarily caused Cynthia's death and that her preexisting health condition and medical and surgical treatment were not substantial contributing factors as required by the law.  Therefore, her death is covered by the Policy as interpreted by Ninth Circuit precedent, *Dowdy*, *supra*.  In *Dowdy*, the Ninth Circuit reaffirmed that the "substantial contribution" test must be used to determine if coverage exists under an

---

[17] As part of Guardian's appeal review, it referred "the claim file and the information [it had] received" to its Nurse Case [Administrator] Annamarie Yanoshik BSN, RN, CCM.  Based on her review, Guardian determined that these materials needed to be reviewed by outside independent medical consultants.

Case No.:



ERISA accidental death and dismemberment policy where both an accident and a preexisting disease caused the insured's dismemberment (or death) loss. The court held that coverage exists, under a policy with substantially identical language to Guardian's Policy, unless the illness "*substantially* contributed to [the insured's] loss." *Id.* at 809 (emphasis in original). It found that merely "contributing to" or "being related to" a loss is not enough to eliminate coverage, despite the policy's language. *Id*. at 809-10. *Dowdy* controls despite the Policy language requiring that an accident must be the sole, direct cause of death independent of all others and that disease and medical or surgical treatment cannot contribute to the death. Guardian's benefits decision was therefore incorrect under *Dowdy*.

39.     Even though in *Dowdy* the court found that diabetes was a "contributing factor" to the insured's dismemberment loss, it held the loss was covered because diabetes was not enough of a factor to meet the "substantial contribution" test. The Ninth Circuit rejected MetLife's denial reasoning, and found that for purposes of the insuring provision and the exclusion, a preexisting illness must "substantially contribute[] to the loss." *Id.* at 808. The court explained that "[i]n order to be considered a substantial contributing factor for the purpose of a provision restricting coverage to direct and sole causes of injury, a pre-existing condition must be more than merely *a* contributing factor." *Id.* at 809 (emphasis original). The court reasoned that "a 'predisposition' or 'susceptibility' to injury, whether it results from congenital weakness or from previous illness or injury, does not necessarily amount to a substantial contributing cause. A mere 'relationship' of undetermined degree is not enough.'" *Id*. at 808 (internal citations and parentheticals omitted).

40.     The court looked to a variety of sources to determine what should be deemed to be a substantial cause. For example, one respected source explained that the word "substantial" denotes that the conduct had an effect strong enough that it would lead "reasonable [people] to regard it as a cause" in the more concrete sense



and not just in some "philosophic sense." *Id.* at 809.  Ultimately, the court held that there must be evidence showing that the preexisting ailment contributed a "significant magnitude of causation" and was a "substantial catalyst." *Id.*  The preexisting condition cannot "merely [be] related to the injury." *Id.*  The court used the following additional phrases that are *not* enough to eliminate coverage for a dismemberment (or death) that is caused in part by an accident: (1) Illness "was a factor" in causing the accidental death/dismemberment loss; (2) Illness was "a complicating factor"; and (3) Illness was an "insignificant cause." *Id.* at 808-10.

41.     Mr. Bergendahl's case is highly analogous to *Dowdy*.  The policy language is essentially the same.  So, despite the Policy's insuring clause and exclusion language (quoted above), the Policy covers Cynthia's death unless her preexisting health condition or medical or surgical treatment "substantially contributed" to her death.  They did not.  The main cause of Cynthia's death was an accident:  She suffered a severe traumatic brain injury, an intracerebral and ventricular hemorrhage, when she accidentally fell and struck her head with great force on the hardwood floor, which internal brain tissue bleeding caused her to die. Cynthia did not die from her liver cirrhosis, any other health condition, or her medical and surgical treatment which were, at most, minor contributing factors, not substantial ones.

42.     The evidence of this is overwhelming.  Cynthia's highly esteemed Hoag Hospital treating neurologist Dr. Puangco, who examined her daily for two weeks right after she was admitted and reviewed her pre-surgery CT scan and medical records, concluded that, *even if she did not have liver disease, she had a 72% chance of dying upon admission solely because of the severe intracerebral traumatic brain injury that she sustained when she accidentally fell and struck her head*.  He based his high ICH score and mortality risk on her coma and the location of her severe brain trauma, inside her brain tissue and ventricles, not on her liver disease.  Dr. Robin agreed with Dr. Puangco's opinion about Cynthia's grim



1    mortality rate just from an intracerebral hemorrhage, irrespective of whether she had

2    liver disease.

3         43.     Even Guardian and its pathologist consultants Drs. Pietruszka and

4    Hayes agreed that Cynthia's accidental fall (where she struck her head on the

5    hardwood floor), directly caused her death.  So did the Coroner and Cynthia's

6    palliative care treating physician Dr. Nguyen (that monitored her for two weeks

7    until she died).  They concluded on the death certificate not only that the accident

8    caused her death, ***but that her liver cirrhosis did not***.  Furthermore, Guardian's *own*

9    consultant Dr. Pietruszka admitted that Cynthia would have had a significant risk of

10   death just from her accidental fall and resulting brain hemorrhage from the trauma,

11   even if she did not have liver cirrhosis and was totally healthy before she struck her

12   head.  He candidly conceded that "it is difficult to claim" and "impossible to

13   hypothesize" otherwise.  Guardian's appeal consultants Drs. Mohan and Hayes both

14   concluded that liver cirrhosis was *a* contributing factor to Cynthia's death but never

15   stated that cirrhosis was a *substantial* contributing factor, the only critical issue

16   under *Dowdy*.[18]  Dr. Pietruszka also admitted that Cynthia underwent successful

17   medical treatment and surgery.

18        44.     Aside from that, Mr. Bergendahl's medical expert's opinion report

19   persuasively shows that severe brain trauma from the fall, not cirrhosis, directly

20   caused Cynthia's death.  Dr. Robin, after an exhaustive investigation, concluded

21   that, in his professional medical opinion as a preeminent forensic pathologist,

22   Cynthia's death was caused by the intracerebral hemorrhage from severe brain

23

24   _____

     [18] While Drs. Hayes and Mohan casually stated, respectively, in their reports without

25   explanation that Cynthia's liver disease was a "significant contributory factor" to
     her death and "played an integral part," they each made several other inconsistent

26   statements.  For example, Dr. Hayes opined twice that Cynthia's liver cirrhosis was
     just "*a* contributing factor" to her death and that: "this was an accidental death due

27   to head trauma *exacerbated* by" cirrhosis.  Dr. Mohan similarly opined that, "Liver
     disease . . . did play *a part* in her bleeding" and "did contribute to her

28   comorbidities."  (Emphasis added).  Their opinions are thus at best internally
     inconsistent and vague on the critical issue that *Dowdy* poses: Did Cynthia's
     cirrhosis *substantially* contribute to her death?



trauma that she suffered when she accidentally fell and struck her head with great force on the hardwood floor, not her liver cirrhosis.  He concluded that her liver cirrhosis did not substantially contribute to her death because her liver and blood laboratory results (that Hoag took when she was hospitalized), showed otherwise. Specifically, her normal aPTT and blood ammonia test results objectively proved that Cynthia's liver was functioning properly, that she had the same ability to form a blood clot as a healthy individual.  But because she did not, and instead bled profusely deep inside her brain tissue after she fell, her labs including her prolonged PT of 19 proved unequivocally that she hemorrhaged and died primarily because of the blunt force trauma to her brain, not from diminished coagulation from cirrhosis, as prolonged PT is often found in fatal brain coagulopathy patients irrespective of liver disease.

45.    Dr. Robin supported his opinions not just with Cynthia's lab results and CT scan imaging, but with nine different peer reviewed scholarly articles and studies from well-respected medical journals regarding coagulopathy in traumatic brain injury patients.  The studies found overwhelmingly that traumatic brain injuries (like Cynthia sustained) are so serious that they often lead to coagulopathy and death in perfectly healthy patients (that did not have liver disease or any other preexisting health condition).  The studies showed that, during an internal brain injury, chemicals are released in the brain that often causes coagulopathy, irrespective of whether the patient has liver disease or not.  And that when a patient has trauma induced intracerebral coagulopathy (like Cynthia had), that in and of itself substantially increases their mortality rate.

46.    Dr. Robin strongly disagreed with Dr. Pietruszka's opinions because he did not even consider the impact of severe internal brain trauma on the ability of a patient's blood to coagulate.  He explained that the medical research strongly shows that severe brain trauma from an accidental fall, in and of itself, frequently leads to an intracerebral hemorrhage, coagulopathy, and death, even in healthy patients that

Case No.:



do not have liver cirrhosis.  But Dr. Pietruszka did not even consider this, making his opinions unpersuasive and disingenuous.

47.     Aside from that, Dr. Pietruszka's opinions are not credible because he lacked significant foundational materials when he performed his analysis.  Unlike Dr. Robin, he never reviewed the Orange County Sheriff-Coroner's Investigation Report.  Nor did he review the declarations of Matthew and Nick Bergendahl, or Dr. Gist's medical records.  Critically, Dr. Pietruszka also did not review the County of Orange Health Care Agency's official death certificate (which included the deputy coroner's opinion and treating physician Dr. Nguyen's opinion about the cause of death).

48.     In the death certificate, Deputy Coroner Estrada and Dr. Nguyen both agreed that Cynthia struck her head on the floor in her home after she accidentally fell, and that complications from the severe brain hematoma that resulted from that accident was the immediate cause of her death.  Not her alcohol liver cirrhosis. They both determined that her cirrhosis was just a "condition[] contributing to death but not resulting in the underlying cause" of death.  They both concluded that cirrhosis did not result in Cynthia's brain hematoma complications, i.e., that her cirrhosis did not cause her cranial bleeding or inability to clot or death.

49.     Their opinions, along with Drs. Robin's opinion, that Cynthia's cirrhosis was not the underlying cause of her death and at most a minor contributing factor should have been carefully reviewed by Guardian's medical consultant but was not.  Dr. Robin explained in his report that a forensic pathologist has a duty to review precisely these types of materials (which he did but Dr. Pietruszka did not). Because Dr. Pietruszka did not have these crucial foundational materials when he investigated the cause of Cynthia's death, his opinions are not credible, and Guardian should not have relied on them to deny Mr. Bergendahl's accidental death claim.  Especially because *all* the other physicians and investigators disagreed with Dr. Pietruszka and because, even he, candidly admitted that a healthy person

-24-

1    without liver cirrhosis likely would have died from Cynthia's accidental fall and

2    resulting brain hemorrhage.

3        50.    There are many other problems with the conclusions of Guardian's

4    medical consultants and thus Guardian's benefits decision that is based on their

5    reports.  First, Dr. Pietruszka, Dr. Mohan, Dr. Hayes, and the vendors through which

6    Guardian retained them, ECN[19] and MCN, [20] are Guardian's paid consultants used

7    repeatedly by Guardian and other insurers in the past to give opinions.  They each

8    cater to the insurance industry according to their Websites.[21]  This Court should

9    review Guardian's claim denial with skepticism because it relied on financially

10   conflicted consultants beholden to the insurance industry.  *See Demer v. IBM*, 835

11   F.3d 893, 901-03 (9th Cir. 2016); *Black & Decker Disability Plan v. Nord*, 538 U.S.

12   822, 832 (2003).

13       51.    Second, Drs. Mohan and Hayes spent just 2.8 and 3.5 hours,

14   respectively, on their entire assignment, including reading all the evidence and

15

16   [19] Many insurers have retained ECN several times just in the last few years per just
     published cases.  *See*, *e.g.*, *Pike v. Hartford Life & Accident Ins. Co.*, 368 F. Supp.
17   3d 1018, 1069 (E.D. Tex. 2019); *Mawa v. Hartford Life & Accident Ins. Co.*, 2019
     WL 267477, at *2 (D. Utah Jan. 18, 2019); *Srinivasan v. Cont'l Assurance Co.*,
18   2019 WL 111040, at *5 (N.D. Cal. Jan. 4, 2019); *Turner v. Life Ins. Co. of N. Am.*,
     2017 WL 6000099, at *3 (W.D. Wash. Dec. 4, 2017); *Wamsley v. Life Ins. Co. of N.*
19   *Am.*, 2016 WL 7469705, at *4 (D. Neb. Sept. 30, 2016); *Groth v. Centurylink*
     *Disability Plan*, 2016 WL 1621724, at *6 (S.D. Ohio Apr. 25, 2016); *Melech v. Life*
20   *Ins. Co. of N. Am.*, 2015 WL 4744356, at *15 (S.D. Ala. Aug. 11, 2015).
     [20] Many insurers have also retained MCN numerous times, as evident just in
21   reported cases.  *See*, *e.g.*, *Johnson v. Life Ins. Co. of N. Am.*, 2017 WL 4180328, at
     *5 (D. Colo. Sept. 21, 2017); *Turner v. Life Ins. Co. of N. Am.*, 2017 WL 6000099,
22   at *3 (W.D. Wash. Dec. 4, 2017); *Miller v. Federated Mut. Ins. Co.*, 2016 WL
     10537608, at *3 (W.D. Tex. Apr. 15, 2016); *Jarillo v. Reliance Standard Life Ins.*
23   *Co.*, 2017 WL 1400006, at *4 (S.D. Cal. Apr. 19, 2017); *Pike v. Hartford Life &*
     *Accident Ins. Co.*, 368 F. Supp. 3d 1018, 1065 (E.D. Tex. 2019); *Haley Spears,*
24   *Plaintiff, V. Liberty Life Assurance Company Of Boston*, 2019 WL 4766253, at *14
     (D. Conn. Sept. 30, 2019); *Potts v. Hartford Life & Accident Ins. Co.*, 272
25   F.Supp.3d 690, 699 (W.D. Pa. 2017); *Killian v. Hartford Life & Accident Ins. Co.*,
     2017 WL 429905, at *6 (E.D. Pa., Jan. 31, 2017); *Coleman v. Am. Int'l Grp., Inc.*
26   *Group Benefit Plan*, 87 F.Supp.3d 1250, 1256 (N.D. Cal. 2015); *Zenadocchio v.*
     *BAE Sys. Unfunded Welfare Ben. Plan*, 936 F.Supp.2d 868, 878 (S.D. Ohio 2013);
27   *Frerichs v. Hartford Life & Acc. Ins. Co.*, 875 F.Supp.2d 923, 935 (D. Minn. 2012).
     [21] *See* (1) ECN, *https://www.ecnime.com/* ("Our clients include . . . insurance
28   carriers . . ."); and (2) MCN, *https://mcn.com/services/medical-peer-reviews/* ("Peer
     Reviews . . . are completed for all insurance types MCN serves . . .")

Case No.:

writing their lengthy peer review reports.[22]  Because Guardian's consultants spent little time investigating the cause of Cynthia's death and formed their opinions without careful, meaningful analysis, their opinions are not credible.

52.     Third, Guardian's consultants' reports are not credible because they directly contradict each other on a critical issue.  Dr. Mohan opined that Cynthia's death was caused by a subdural hematoma.  Dr. Hayes, in contrast, concluded that it was caused by an intracranial hematoma like Dr. Robin, which is far more fatal.  He stated, "I agree with Dr. Robin that the coroner's statement of cause of death – complications of subdural hematoma – is incorrect."  Because Guardian's own consultants could not even agree amongst themselves on a key issue, it should not have relied on them to deny Plaintiff's claim, especially because it never gave Plaintiff's expert Dr. Robin an opportunity to respond to them as required by the ERISA regulations.

53.     Fourth, Dr. Mohan is a gastroenterologist, and his opinion fails to address the nature and extent of the severe injury caused by the tragic fall.  He is not a pathologist or hepatologist and does not have the requisite education, training and experience to render an opinion.  His opinion ignores the fact that Ms. Bergendahl's liver was functioning adequately when she was admitted to the hospital, as was indicated by normal ammonia levels at the time.  Dr. Mohan provided no real support for his conclusion that cirrhosis played an integral part in Ms. Bergendahl's death.

54.     Fifth, the bias in Dr. Mohan's opinion is underscored by his mischaracterization of Dr. Robin's opinion.  Shockingly, Dr. Mohan claimed that Dr. Robin viewed Ms. Bergendahl's cirrhosis as "just an innocent bystander in the circumstances of her fall."  *See* A.R. at 438.  Instead of addressing the fact that

---

[22] Their invoices were for $1,710 (Mohan) and $2,137.50 (Hayes).  Plaintiff's pathologist expert billed at $925 per hour.  It is thus reasonable to infer that Guardian's medical experts were billed out at least at $600 per hour, especially since Dr. Hayes is also a pathologist.

Case No.:



Ms. Bergendahl sustained substantial damage from the fall – suffering a 70cc *intracerebral* hemorrhage – Dr. Mohan chose to focus on the post-operative course and on the fact that, "The liver is a very important organ in the physiology of the human body." He said little more to support his criticism of Dr. Robin's thorough analysis of the causation, and nothing to dispute the opinion of Dr. Puangco that Ms. Bergendahl had a **72% mortality risk** from the fall alone. Moreover, Dr. Mohan completely ignored the fact that her ammonia levels were normal on admission, which indicated that her liver was functioning adequately at the time.

55.     Sixth, Dr. Mohan also noted that "cirrhosis ***can*** cause encephalopathy which ***can*** cause confusion and falls . . . [which] ***can*** lead to bleeding anywhere in the body." *See* A.R. at 437 (emphasis added). He then noted *only* that: "In her case she had facial bleeding as well as intracranial bleeding." *Id.* But he did not address whether the facial bleeding was caused by the fact that she fell on her head/face. Six days after the fall, Plaintiff observed prominent dark blue/purple bruising on the front and right side of her head and face which was consistent with his brother's description of the injury sustained to the right side of her head. Dr. Mohan essentially ignored the relevant evidence because it did not support the conclusion that he was paid to provide.

56.     Seventh, Dr. Hayes consulted with Dr. Mohan for approximately 30 to 45 minutes before he prepared his conclusory and cursory analysis. Not surprisingly, Dr. Hayes' report reveals many of the same convenient omissions of relevant evidence as does Dr. Mohan's.

57.     Eighth, although Dr. Hayes' report indicates that he reviewed the declarations of Matthew and Nick Bergendahl, he otherwise failed to address any of the facts in those declarations. Accordingly, Dr. Hayes failed to consider the circumstances related to the fall that caused the brain bleed that led to Ms. Bergendahl's death. Incredibly, Dr. Hayes' report even speculates that Ms.



Bergendahl's head injury occurred at a different time – without providing any basis for that conclusion.  *See* A.R. at 450-51.

58.    Ninth, Dr. Hayes also chose to ignore or improperly discount the fact that Ms. Bergendahl's ammonia levels on admission and shortly thereafter were *normal*: 15 and 16 micromoles per liter.  *Id.* at 463, 544, 581, 639, 795, 1419.  Instead, he chose to reference the only other ammonia level, 38, a number that is only slightly above the normal range (*Id.* at 925, 1235, 1499).  Dr. Hayes did correctly note that the only lab test result for ammonia included with the medical records provided by Hoag – but it was the only resultthat was beyond the normal levels.  Dr. Hayes appears to have drawn the inference that the absence of formal test results negates the fact that her ammonia levels were normal at all other times measured.

59.    To his credit, Dr. Hayes did admit that intracranial hemorrhage was not secondary to alcoholic cirrhosis, and he opined only that the cirrhosis resulted in "bruising of the brain significantly worse than she would have sustained if she had not had cirrhosis." *Id*. at 450.

60.    Finally, Dr. Hayes also stated that he felt that "cirrhosis was a contributory factor in her development of such severe brain bleeding," but he specifically stated that he "would not argue that she died from cirrhosis."  He also declined to state that cirrhosis was a *substantial* contributing cause of her death (instead he just failed to accept that the severity of her intracranial hemorrhage itself caused her death).  *Id.* at 451.  Because the reasonable inference from Dr. Hayes' conspicuous silence on the most critical issue is that Cynthia's liver cirrhosis did not substantially contribute to her death and only contributed to it, Guardian's appeal denial based thereon was patently incorrect.  Therefore, even considering Guardian's own consultant's opinion, Cynthia's death is covered by the Policy as interpreted by Ninth Circuit precedent, *Dowdy*, because her liver cirrhosis did not substantially cause her death, her fall did.



61.     In sum, the paper reviews of Guardian's hired doctors are far less credible than the opinion of Dr. Robin.  They were unaware of the proper "substantial contributing cause" standard by which they were to give an opinion. Moreover, the paper reviews do not establish that cirrhosis was a substantial contributing cause of Ms. Bergendahl's death, as required under Ninth Circuit law to eliminate coverage under the Policy for her accidental fall.

62.     The proper standard of review is de novo.  Any grant of discretionary authority contained in the Policy is void in light of California Insurance Code Section 10110.6.  Plaintiff and his deceased mother were California residents at all times relevant.  The Policy was renewed after January 1, 2012, the date on which the statute became effective.  Guardian rendered its benefits decision after that date. Accordingly, the denial of benefits at issue must be reviewed de novo.  In de novo review, "the burden of proof is placed on the claimant" to establish entitlement to plan benefits.  *See Muniz v. Amec Constr. Mgmt., Inc.*, 623 F.3d 1290, 1294 (9th Cir. 2010).

63.     Regardless of the standard of review that this Court applies, Guardian reached an incorrect benefit decision by refusing to pay Mr. Bergendahl's claim for AD&D insurance in the amount of $204,000.

64.     Plaintiff exhausted his administrative remedies under the Plan and has the right to bring a legal action for benefits and equitable relief under ERISA Section 502(a).  Guardian's September 29, 2021 denial letter on appeal affirmed this, stating that he had "the right to bring a civil suit under federal law . . . ."

### FIRST CLAIM FOR RELIEF

To Recover Benefits, Attorneys' Fees and Pre-Judgment Interest

under ERISA Plan – 29 U.S.C. Sections 1132(a)(1)(B), (g)(1)

(Plaintiff against Guardian and Does 1 through 10)

65.     Plaintiff incorporates by reference each of the foregoing paragraphs of this Complaint, as though fully set forth herein.

Case No.:



66.     ERISA Section 502(a)(1)(B), 29 U.S.C. Section 1132(a)(1)(B), permits plan beneficiaries like Plaintiff to bring a civil action to receive benefits due to him under the terms of a plan, to enforce his rights under the terms of a plan and/or to clarify his rights to future benefits under the terms of a plan.

67.     At all times relevant, Plaintiff has been entitled to AD&D benefits under the Plan in the amount of $204,000 as his late mother's designated beneficiary.  By denying Plaintiff's claim for unpaid AD&D benefits in this amount, and by related acts and omissions, Guardian violated, and continues to violate, the terms of the Plan, and Plaintiff's rights thereunder.

68.     Guardian has failed to follow claims processing requirements of ERISA and of the Department of Labor Regulations and has failed to conduct a "full and fair review" of the claim denial, an act required by 29 U.S.C. Section 1133(2). Thus, even if the Plan vests discretion in Guardian to make benefit determinations, no deference is warranted with regard to Guardian's handling of this claim.  *See Booton v. Lockheed Medical Benefit Plan*, 110 F.3d 1461, 1465 (9th Cir. 1997); *Jebian v. Hewlett-Packard Company Employee Benefits Organization Income Protection Plan*, 349 F.3d 1098, 1105 (9th Cir. 2003) ("When decisions are not in compliance with regulatory and plan procedures, deference may not be warranted.").

69.     In this case, Guardian improperly based the denial of Plaintiff's appeal on evidence that, in violation of applicable regulations, Guardian failed to provide to him for review.  Plaintiff was not given the opportunity to review the opinions of Guardian's paper reviewers, Drs. Mohan and Hayes, and accordingly, its decision to deny benefits is not entitled to deference.

70.     Plaintiff is informed and believes, and on that basis alleges, that Guardian is both a funding source and claims fiduciary of the Plan, and thus has a structural conflict of interest.  Therefore, even assuming that the Plan vests any discretion in Guardian to make benefit determinations, this Court's review of such determinations to decide whether there was an abuse of discretion must take into



consideration all of the relevant facts and circumstances.

71.    A "prudent person" standard is imposed on ERISA fiduciaries.  *See* 29 U.S.C. § 1104(a)(1)(b).  A "fiduciary" is also under a duty of loyalty and care to the participants and beneficiaries of the Plan.  *See* 29 U.S.C. § 1104(a)(1).  Under ERISA: (1) a fiduciary must perform its duties solely in the interest of plan participants and beneficiaries and for the exclusive purpose of providing plan benefits to them; (2) a fiduciary must act with care, skill, prudence and diligence; and (3) a fiduciary may not act in any capacity involving the plan on behalf of a party whose interests are adverse to the interests of the plan, its participants or its beneficiaries.  Guardian's handling of Plaintiff's claim for AD&D benefits fell far short of these standards.

72.    For all of the reasons set forth above, the decision deny AD&D benefits was arbitrary, capricious, wrongful, unreasonable, irrational, incorrect, contrary to the evidence, contrary to the terms of the Plan and contrary to law. Guardian improperly denied this claim, as the evidence shows that its denial decision was not only incorrect but arbitrary and capricious.  Further, Guardian's denial decision and related actions heighten the level of skepticism with which a court views a conflicted administrator's decision under *Abatie v. Alta Health & Life Insurance Co.*, 458 F.3d 955 (9th Cir. 2006) and *Metropolitan Life Insurance Co. v. Glenn*, 544 U.S. 105 (2008).  Based upon all of the evidence discussed herein, Guardian's denial of Plaintiff's claim was incorrect, improper and an abuse of discretion.

73.    Based upon all of the evidence discussed above, Plaintiff has met the burden of establishing on a de novo review that he is entitled to AD&D benefits under the Plan in the amount of $204,000 and that Guardian's denial of Plaintiff's claim was incorrect and improper.

74.    A court must construe ambiguities in an ERISA plan against the drafter and in favor of the reasonable expectations of the insured/plan participant.  *See Mongeluzo v. Baxter Travenol Long Term Disability Benefit Plan*, 46 F.3d 938, 942

Case No.:



(9th Cir. 1995); *Barnes v. Indep. Auto. Dealers Ass'n Health & Benefit Plan*, 64 F.3d 1389, 1393 (9th Cir. 1995); *Gaines*, *supra*, 329 F.Supp.2d at 1216-17.

75.     Further, an insurer/claims administrator wishing to avoid liability on a policy must make exclusionary and other limiting clauses conspicuous, plain and clear, placing them in such a fashion as to make obvious their relationship to other policy terms, and must bring such provisions to the attention of the insured.  *See Saltarelli v. Bob Baker Group Medical Trust*, 35 F.3d 382, 386-87 (9th Cir. 1994); *cf. Kunin v. Benefit Trust Life Ins. Co.*, 910 F.2d 534, 540 (9th Cir. 1990) (The state-law principle of contra proferentem applies to the federal courts' interpretation of ERISA insurance contracts; in the context of interpreting ambiguous provisions, "the insurer should be expected to set forth any limitations on its liability clearly enough for a common layperson to understand.").  In general, courts will protect the reasonable expectations of applicants, insureds and intended beneficiaries regarding the coverage afforded by insurance carriers even though a careful examination of the policy provisions indicates that such expectations are contrary to the expressed intention of the insurer.  *Saltarelli*, *supra* at 386 ("Protecting the reasonable expectations of insureds appropriately serves the federal policies underlying ERISA, including provision of adequate information to plan participants and protection of their interests.")[23]

---

[23] ERISA's statutory declaration of policy, 29 U.S.C. sSection 1001(a), states that "owing to the lack of employee information and adequate safeguards concerning their operation, it is desirable in the interests of employees and their beneficiaries . . . that disclosure be made and safeguards be provided with respect to the establishment, operation, and administration of such plans."  It continues:

> It is hereby declared to be the policy of this chapter to protect . . . the interests of participants in employee benefit plans and their beneficiaries, by requiring the disclosure and reporting to participants and beneficiaries of financial and other information with respect thereto, by establishing standards of conduct, responsibility, and obligation for fiduciaries of employee benefit plans, and by providing for appropriate remedies, sanctions, and ready access to the Federal courts.

29 U.S.C. § 1001(b).

Case No.:



76.    As a direct and proximate result of Guardian's denial of accidental death benefits, Plaintiff has been deprived of the accidental death benefits to which he was and is entitled under the Policy.

77.    As a direct and proximate result of the denial of his claim for accidental death benefits, Plaintiff has been required to incur attorneys' fees to pursue this action and is entitled to reimbursement of these fees pursuant to 20 U.S.C. § 1132(g)(1).

78.    Plaintiff alleges all of the same conduct against Defendants Does 1 through 10 as he does against Defendant Guardian in this First Claim for Relief and in this Complaint.

## **PRAYER FOR RELIEF**

**WHEREFORE**, Plaintiff prays that the Court grant the following relief against all Defendants:

1.    For all Plan benefits due and owing Plaintiff, including the unpaid accidental death and dismemberment insurance benefit of $204,000.

2.    For costs and reasonable attorneys' fees pursuant to 29 U.S.C. Section 1132(g).

3.    For pre-judgment and post-judgment interest on the principal sum, accruing from the date on which the obligations were incurred.  *See Blankenship v. Liberty Life Assurance Co. of Boston*, 486 F.3d 620, 627 (9th Cir. 2007) ("A district court may award prejudgment interest on an award of ERISA benefits at its discretion."); *Drennan v. General Motors Corp.*, 977 F.2d 246, 253 (6th Cir. 1992).  Specifically, Plaintiff seeks interest at the rate of 10% per annum, pursuant to California Insurance Code Section 10111.2.

5.    For such other and future relief as this Court deems just and proper.

Case No.:



In the alternative, in the event that the Court does not find in favor of Plaintiff's entitlement to the AD&D benefit, Plaintiff prays that the matter be remanded to Guardian in order to give Plaintiff the opportunity to address the new evidence on which Guardian relied in denying the claim – evidence that Plaintiff was not given the opportunity to address in its appeal due to Guardian's violation of the applicable regulations.

Dated:  February 8, 2022                    MCKENNON LAW GROUP PC

                                            By: _____
                                            ROBERT J. McKENNON
                                            JOSEPH S. McMILLEN
                                            Attorneys for Plaintiff,
                                            Matthew Bergendahl

Case No.: